**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Nicholaus H. Woltering (SBN 337193)
  nwoltering@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002

*Attorneys for Plaintiff and the*
*Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINICK BATTIATO, on behalf of himself and all others similarly situated,<br><br>                                        Plaintiff,<br><br>        v.<br><br>TESLA, INC., dba TESLA MOTORS, INC.; TESLA LEASE TRUST; and TESLA FINANCE LLC,<br><br>                                        Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>1.  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW<br><br>2.  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW<br><br>3.  VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT<br><br>4.  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT<br><br>5.  BREACH OF EXPRESS WARRANTY<br><br>6.  BREACH OF IMPLIED WARRANTIES<br><br>7.  FRAUD AND DECEIT<br><br>8.  NEGLIGENT MISREPRESENTATION<br><br>9.  UNJUST ENRICHMENT<br><br>10. NEGLIGENCE<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

1

## <u>TABLE OF CONTENTS</u>

2

Page

3     I.     INTRODUCTION ............................................................................................ 1

4     II.    JURISDICTION AND VENUE ....................................................................... 4

5     III.   PARTIES ......................................................................................................... 5

6            A.     Plaintiff ............................................................................................... 5

7            B.     Defendants ........................................................................................... 5

8     IV.    FACTUAL ALLEGATIONS .......................................................................... 6

9     V.     CLASS ACTION ALLEGATIONS .............................................................. 24

10    VI.    CLAIMS FOR RELIEF ................................................................................ 28

11           FIRST CLAIM
             Violation of the California Unfair Competition Law
12           Cal. Bus. & Prof. Code § 17200, *et seq.* ...................................... 28
             SECOND CLAIM
13           Violation of the California False Advertising Law
             Cal. Bus. & Prof. Code § 17500, *et seq.* ...................................... 32
14           THIRD CLAIM
             Violation of the California Consumers Legal Remedies Act
15           Cal. Civ. Code § 1750, *et seq.* ...................................................... 33
16           FOURTH CLAIM
             Violation of the Magnuson-Moss Warranty Act
17           15 U.S.C. § 2301, *et seq.* .............................................................. 35
             FIFTH CLAIM
18           Breach of Express Warranty
19           Cal. Civ. Code §§ 1791.2(a), 1794 ................................................. 37
             SIXTH CLAIM
20           Breach of Implied Warranties
             Cal. Civ. Code §§ 1791.1, 1792, 1794 ........................................... 39
21           SEVENTH CLAIM
             Fraud and Deceit ............................................................................. 41
22           EIGHTH CLAIM
             Negligent Misrepresentation ........................................................... 43
23           NINTH CLAIM
             Unjust Enrichment ........................................................................... 43
24           TENTH CLAIM
             Negligence ....................................................................................... 44
25

26    VII.   PRAYER FOR RELIEF ................................................................................ 45

27    VIII.  DEMAND FOR JURY TRIAL ..................................................................... 45

28

1    Plaintiff Dominick Battiato, an individual, on behalf of himself and all others similarly situated

2    (*i.e.*, the members of the Class described and defined within this Complaint), brings this class action

3    complaint against Defendants Tesla, Inc., dba Tesla Motors, Inc., Tesla Lease Trust, and Tesla Finance

4    LLC (collectively, "Defendants" or "Tesla"), and alleges as follows:

5    **I.    INTRODUCTION**

6        1.    This consumer class action arises out of Tesla's misleading and deceptive statements

7    regarding its advanced driver assistance systems ("ADAS") technology. Tesla's ADAS technology is

8    deceptively and misleadingly marketed as autonomous driving technology under various names,

9    including "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability" ("FSD").  Tesla

10   deceived and misled consumers regarding the abilities of its ADAS technology and by representing

11   that it was perpetually on the cusp of perfecting that technology and finally producing a fully self-

12   driving car.

13       2.    Tesla has known for years that its statements regarding its ADAS technology were

14   deceptive and misleading, but the company made them anyway. Tesla did so to generate excitement

15   and interest in the company's vehicles and thereby improve its financial condition by, among other

16   things, attracting investment, increasing sales, avoiding bankruptcy, driving up Tesla's stock price,

17   and helping to establish Tesla as a dominant player in the electric vehicle market.

18       3.    For example, in 2016 Elon Musk tweeted a bold prediction—that a Tesla vehicle

19   would complete a fully self-driving trip *across the United States* by "next year." Later in 2016, Tesla

20   announced on its official blog that "All Tesla Cars Being Produced Now Have Full Self-Driving

21   Hardware." The blog post included the misleading October 2016 video of a Tesla car purportedly

22   driving itself without incident, and suggested that Tesla was on the cusp of bringing to market cars

23   that would be fully "self-driving" and have "full autonomy."[1] When Tesla and Musk made these

24   statements, they knew there was no reasonable chance of Tesla being able to meet those promises.

25

26

27   _____

     [1] *See* The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware,"
28   https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct.
     19, 2016).

CLASS ACTION COMPLAINT                                                                                1

4.       From approximately 2017 to 2019, Tesla's website describing its "Full Self-Driving Capability" technology represented that consumers who purchased or leased cars with the FSD version of its ADAS technology would receive cars capable of "full self-driving in almost all circumstances," including being able to "conduct short and long distance trips with no action required by the person in the driver's seat" and with a "probability of safety at least twice as good as the average human driver." On the same webpage, Tesla went on to state:

> All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed.

5.       Indeed, in every year since 2016, Tesla has repeatedly made deceptive and misleading statements to consumers indicating that a fully self-driving, fully autonomous Tesla vehicle was just around the corner, often expressly stating that would occur by the end of that calendar year or within the "next year."[2] For example, in May 2019, after years of failing to deliver on prior promises, Musk again promised consumers that a fully self-driving Tesla car would be available by the end of that year, tweeting that "everyone with Tesla Full Self-Driving will be able" to take a fully automated trip in their Tesla from Los Angeles to New York.[3] While tens of thousands of U.S. and California consumers have purchased or leased new Tesla vehicles with ADAS technology in 2019 and every year since, Tesla has yet to deliver on its repeated promises of a fully self-driving car at *any* distance—much less a fully automated three-thousand-mile journey across the country.

6.       The reality of Tesla's ADAS technology is far different from what Tesla and Musk have spent years telling consumers. Instead of providing its customers the "Full Self-Driving Capability" they paid for, Tesla uses them as guinea pigs to test drive its experimental FSD Beta software on public roadways, which generates data that Tesla can use to improve its software. Along the way,

---

[2] *See, e.g.*, The Dawn Project, "Elon Musk's broken promises," https://dawnproject.com/wp-content/uploads/2022/06/The-Dawn-Project-Musk-promises-1min-NA.mp4?_=2 (collecting video clips of Musk making such promises from 2014 to 2021).
[3] Elon Musk, https://twitter.com/elonmusk/status/1126611407984779264 (May 9, 2019, 3:14 pm).

1   scores of Tesla owners who believed Tesla's deceptive and misleading statements about the

2   capabilities of Tesla's ADAS technology have been killed and seriously injured when that technology

3   failed, often in the face of routine roadway scenarios.

4         7.      Even Tesla itself has admitted that "Full Self-Driving" is an inaccurate name. In

5   response to California regulators' concerns about Musk's public announcements in late 2020 indicating

6   that a new FSD Beta update would make Tesla vehicles autonomous, Tesla attorneys sent private

7   emails to those regulators (later disclosed in response to Public Records Act requests) walking those

8   statements back and making clear they were false. Tesla attorneys told the regulators that Tesla

9   vehicles equipped with so-called "Full Self-Driving Capability" were not fully self-driving at all, but

10  still required the driver to steer, brake, and accelerate as needed. In the meantime, Tesla and Musk

11  continued their deceptive marketing to consumers.

12        8.      Plaintiff Dominick Battiato is California resident, who owns a 2021 Tesla Model 3

13  Performance and a 2022 Tesla Model Y Performance.

14        9.      Plaintiff brings this class action lawsuit on behalf of himself and fellow consumers who

15  purchased or leased a new Tesla vehicle with Tesla's ADAS technology but never received the self-

16  driving car that Tesla promised them. Plaintiff brings claims against Tesla for violations of the federal

17  Magnuson-Moss Warranty Act and California's False Advertising Law, Consumers Legal Remedies

18  Act, and Unfair Competition Law, as well as common law claims for fraud and deceit, negligent

19  misrepresentation, negligence, and unjust enrichment. Plaintiff seeks various relief on behalf of

20  himself and the proposed Class, including injunctive relief prohibiting Tesla from continuing its

21  deceptive and misleading marketing of its ADAS technology, restitution of the money Plaintiff and

22  Class members paid for technology that Tesla promised but never delivered, and all available damages

23  including punitive damages to punish Tesla for years of using deceptive and misleading marketing to

24  eventually establish itself as a dominant player in the electric vehicle market.

25        10.     Based on information and belief, Plaintiff alleges that at all times mentioned herein,

26  Defendants and all unknown co-conspirators were an agent, servant, employee and/or joint venture of

27  each other, and were at all times acting within the course and scope of said agency, service,

28  employment, and/or joint venture with full knowledge, permission, and consent of each other. In

CLASS ACTION COMPLAINT                                                                            3

1   addition, each of the acts and/or omissions of each Defendant and unknown co-conspirator alleged

2   herein were made known to, and ratified by, Defendants. Plaintiff will seek leave of Court to amend

3   this Complaint to reflect the true names and capacities of the unknown co-conspirators when such

4   identities become known.

5       11.     To the extent that there are any statutes of limitations applicable to Plaintiff's and Class

6   members' claims, the running of the limitations periods has been tolled by, *inter alia*, the following

7   doctrines or rules: equitable tolling, the discovery rule, the fraudulent concealment rules, equitable

8   estoppel, the repair rule, and/or class action tolling.

9   **II.     JURISDICTION AND VENUE**

10      12.     **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this

11  action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as Plaintiff seeks

12  damages and other relief on behalf of a class consisting of hundreds of thousands of individuals. This

13  action meets CAFA's jurisdictional requirements because the sum or value of the relief sought

14  exceeds $5,000,000 exclusive of interest and costs, and because at least one Class member is a citizen

15  of a state different from Defendants under § 1332(d)(2)(A) and/or a citizen of a foreign state under §

16  1332(d)(2)(B). The Court also has federal question jurisdiction over Plaintiff's Magnuson-Moss

17  Warranty Act claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law

18  claims under § 1367.

19      13.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because

20  they have conducted and continue to conduct substantial business in California, and have sufficient

21  minimum contacts with California in that (1) from the beginning of the Class Period (as defined

22  herein) until December 2021, Defendant Tesla, Inc. was headquartered in Palo Alto, California, and

23  thus designed, developed, manufactured, tested, and marketed its vehicles and ADAS technology at

24  issue in this action in California throughout that period; (2) throughout the Class Period, Tesla, Inc.

25  tested and manufactured a substantial percentage of the Class Vehicles (as defined herein) at its factory

26  in Fremont, California; (3) throughout the Class Period, Tesla, Inc. has been the direct or indirect

27  owner and operator of dozens of retail Tesla stores in California (accounting for more than a quarter of

28  Tesla stores nationwide) that market and sell or lease new Tesla vehicles, including a substantial

1  percentage of Class Vehicles; (4) throughout the Class Period, California has been by far the largest

2  U.S. market for sales and leases of new electric vehicles, including sales and leases of new Tesla

3  vehicles and Class Vehicles; (5) throughout the Class Period, Defendants developed the marketing

4  scheme at issue in this action in California and targeted California consumers with that marketing

5  scheme, including deceptive and misleading statements about Tesla's vehicles and ADAS technology

6  on Tesla's website and Musk's Twitter feed; (6) Tesla, Inc. is registered with the California Secretary

7  of State to do business in the State of California, and is licensed by the California Department of Motor

8  Vehicles as a vehicle dealer and a vehicle manufacturer; and (7) Defendant Tesla Finance LLC has its

9  principal place of business in California.

10       14.    **Venue**. Venue is proper in the United States District Court for the Northern District of

11  California under 28 U.S.C. § 1391(b)(1) because Defendants are subject to the Court's personal

12  jurisdiction with respect to this action and therefore reside in this District for purposes of venue, under

13  § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims

14  occurred in this District (including both Defendants' wrongful conduct and the resulting harm to

15  Plaintiff and Class members residing in this District), and under § 1391(b)(2) because a substantial

16  part of the property that is the subject of this action is situated in this District.

17  **III.   PARTIES**

18       **A.    Plaintiff**

19       15.    Plaintiff Dominick Battiato is a resident of Valencia, California. In June 2021, Plaintiff

20  purchased a new 2021 Tesla Model 3 Performance. In March 2022, he purchased a new 2022 Tesla

21  Model Y Performance. Plaintiff made the decision to purchase these vehicles after researching,

22  viewing, and relying on Tesla's online and other public statements, including those made by Musk,

23  which were disseminated to consumers throughout the State of California, the U.S., and the world.

24  Plaintiff has experienced sudden and unexpected braking in both vehicles as a result of defects related

25  to Tesla's ADAS technology.

26       **B.    Defendants**

27       16.    **Tesla, Inc.** Defendant Tesla, Inc., dba Tesla Motors, Inc., is a Delaware corporation

28  that had its principal place of business in Palo Alto, California, from approximately 2003 until

CLASS ACTION COMPLAINT                                                                    5

December 1, 2021, at which point it moved its principal place of business to Austin, Texas. Defendant designs, develops, manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla." Defendant also offers services related to those vehicles, including designing, developing, and periodically sending over-the-air updates for the ADAS software in Tesla vehicles.

17.     Tesla, Inc. has a vertically integrated business model. (a) Tesla designs, develops, manufacturers, and tests its electric vehicles and the ADAS software on those vehicles. This includes all versions of Tesla's ADAS technology (*e.g.*, Autopilot, Enhanced Autopilot, FSD), which were and are designed, developed, manufactured, and tested by Tesla in the State of California at its Palo Alto offices, Fremont factory, and other California offices and facilities. On information and belief, all or a substantial majority of the Class Vehicles (as defined herein) were manufactured and tested in California. (b) Tesla markets its vehicles on its website, in marketing materials, in its brick-and-mortar galleries and showrooms, and through the tweets, media interviews, news conferences, earnings calls, conferences, forums, and other public events and statements by its representatives and agents, including Elon Musk, all of which are intended and designed to generate media coverage, and have been historically successful at doing so. (c) Tesla sells and leases its electric vehicles directly to consumers, including through its website and retail stores, which Tesla owns and operates.

18.     **Tesla Lease Trust**. Defendant Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a leasing program managed by Tesla Finance LLC.

19.     **Tesla Finance LLC**. Defendant Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc., and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust and, as an agent of the Tesla Lease Trust, originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in California.

## IV.     FACTUAL ALLEGATIONS

### A.     The Technology of Autonomous Vehicles

20.     SAE International, formerly the Society of Automotive Engineers, is a U.S.-based professional association and standards development organization founded in the early 20th century.

In 2014, SAE International took a leading role in the development of autonomous vehicle technology standards by publishing the initial version of *SAE J3016 Recommended Practice: Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*, commonly referred to as the SAE Levels of Driving Automation ("SAE Levels"). Following this, SAE International published revised versions of the SAE Levels in 2016, 2018, and 2021.[4]

21.     The SAE Levels provide a taxonomy of vehicle driving automation systems with detailed definitions for six levels for driving automation, ranging from no driving automation (SAE Level 0) to full driving automation (SAE Level 5). The SAE Levels can be summarized as follows: **Level 0: No Driving Automation.** The human driver performs all driving tasks (steering, acceleration, braking, etc.), although vehicles may have safety features like automatic emergency braking and forward collision warning. **Level 1: Driver Assistance.** The vehicle has features that provide a small degree of automation over the vehicle's acceleration, braking, or steering (*e.g.*, adaptive cruise control, lane-keeping assistance). **Level 2: Partial Driving Automation.** The vehicle can perform multiple driving tasks (*e.g.*, acceleration, steering) but remains under the human driver's constant supervision, responsibility, and control. **Level 3: Conditional Driving Automation.** The vehicle can take full control of certain driving tasks such that the human driver need not remain constantly alert but must be ready to intervene upon request from the vehicle. **Level 4: High Driving Automation.** The vehicle can perform all driving tasks in specific locations or environments, but human override is still an option. **Level 5: Full Driving Automation.** The vehicle can perform all driving tasks under all conditions, with zero human attention or interaction required.

22.     The SAE Levels are a widely accepted international standard and have been adopted by regulatory agencies such as the National Transportation Safety Board ("NTSB"), National Highway Traffic Safety Administration ("NHTSA"), and U.S. Department of Transportation.

23.     SAE International refers to SAE Level 1 and 2 technologies as systems or features that provide "driver support," whereas it refers to SAE Level 3, 4, and 5 technologies as systems or features that provide "automated driving." When SAE International published the current version of

---

[4] *See* SAE International, "Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*"* (revised Apr. 30, 2021), https://www.sae.org/ standards/content/j3016_202104.

the SAE Levels in 2021, it noted that for SAE Level 2 driver-support features, "You <u>are</u> driving whenever these driver support features are engaged" and "You must constantly supervise these support features."[5]

24.     In May 2022, the NHTSA published a graphic summarizing the SAE Levels, which drives home many of the same points as the 2021 SAE International graphic—*i.e.*, that at SAE Levels 0 to 2, the driver is fully responsible for driving the car ("You drive, you monitor"), whereas autonomous technology does not begin until SAE Level 3 ("System drives, you must be able to take over upon request"), and fully self-driving technology does not occur until SAE Levels 4 and 5 ("System drives, you ride").[6]

25.     While Tesla and Musk have routinely promised Tesla's SAE Level 2 ADAS technology (including Autopilot and FSD) would rapidly advance to SAE Level 5 abilities within a year or other short period of time, Tesla's technology has never advanced beyond SAE Level 2.

26.     While Tesla has spent year after year stuck at SAE Level 2, other vehicle manufacturers have successfully designed and developed SAE Level 3 features, including Audi in 2017, Honda in 2021, and Mercedes-Benz in 2021. Honda and Mercedes-Benz both currently offer automobiles with Level 3 features for sale or lease to the public in their respective home markets of Japan and Europe. Meanwhile, Waymo has been operating limited SAE Level 4 taxi service on public roadways in some areas of Phoenix (since 2018) and San Francisco (since 2021).

27.     Whereas Tesla's Level 2 technology relies heavily on cameras (with limited assistance from a single forward-facing radar unit), the successful design and development of safer and more advanced Level 3 and 4 systems to date has universally relied on a more robust and expensive combination of cameras, multiple radar units, and one or more lidar units. The general consensus among autonomous vehicle experts is that truly autonomous, self-driving cars cannot be achieved without some reliance on lidar technology, which Tesla has always refused to use because of considerations related to expense and aesthetics.

---

[5] SAE International, "SAE Levels of Driving Automation Refined for Clarity and International Audience" (May 3, 2021), https://www.sae.org/blog/sae-j3016-update.
[6] NHTSA, "Levels of Automation" (May 2022), *available at* https://www.nhtsa.gov/sites/nhtsa.gov/files/2022-05/Level-of-Automation-052522-tag.pdf.

**B.      Tesla's "Autopilot"**

28.     In 2014, Tesla began equipping its Model S sedan with hardware that (although the necessary software was not yet active) was intended to allow vehicles to automate some steering, braking, and acceleration functions. Consistent with widely used industry terminology, Tesla originally called this feature "advanced driver assistance" before Tesla executives led by Musk decided to change the name to "Autopilot." Tesla engineers expressed concerns that the name was misleading and suggested less misleading options such as "Copilot," which Tesla rejected.[7]

29.     In October 2015, Tesla released its version 7.0 software, which enabled Autopilot on Model S vehicles. Robert Rose, the head of the Autopilot project, left Tesla shortly before the release. Evan Nakano, a Tesla Autopilot engineer who had worked on safety features, objected that Autopilot was not ready for release. When Tesla ignored his concerns, Nakano resigned in protest and wrote a resignation letter, circulated widely among Tesla employees, that called Autopilot's development based on "reckless decision making that has potentially put customer lives at risk."[8]

30.     By December 2015, Musk was publicly stating that Tesla vehicles would drive themselves within about two years. He told *Fortune* magazine, "I think we have all the pieces, and it's just about refining those pieces, putting them in place, and making sure they work across a huge number of environments—and then we're done. It's a much easier problem than people think it is."[9]

31.     In January 2016, Musk announced on a conference call with reporters that Autopilot was "probably better" than a human driver. He stated that Tesla vehicles would be able to drive significantly better than humans within two to three years, and that within approximately two years drivers would be able to use Tesla's "Summon" feature, which allows drivers to remotely instruct

---

[7] Cade Metz & Neal E. Boudette, "Inside Tesla as Elon Musk Pushed an Unflinching Vision for Self-Driving Cars," *The New York Times* (Dec. 6, 2021), *available at* https://www.nytimes.com/ 2021/12/06/technology/tesla-autopilot-elon-musk.html Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.
[8] Ianthe Jeanne Dugan & Mike Spector, "Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers," *The Wall Street Journal* (Aug. 24, 2017), *available at* https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742.
[9] Kristen Korosec, "Elon Musk Says Tesla Vehicles Will Drive Themselves in Two Years," *Fortune* (Dec. 21, 2015), *available at* https://fortune.com/2015/12/21/elon-musk-interview/.

their vehicle to drive to a specified location, to summon a vehicle from the other side of the country.[10]

32.     Ten days later, on January 20, 2016, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full speed on a highway into the back of a large street sweeper. The facts of the accident strongly indicate that Autopilot was engaged at the time of the crash.[11]

33.     In February 2016, Consumer Reports tested Tesla's new Summon feature, which Tesla claimed makes the car able to drive itself for short distances without anyone in the car, such as to enter or leave a parking space or garage. Although Consumer Reports had previously given Tesla vehicles rave reviews (scoring Tesla's Model S a 99 out of 100 and calling it "the best car we have every tested" in 2013, and scoring another version of the Model S even higher in 2015), this time Consumer Reports' testing revealed that the Summon feature failed to detect "several large objects that a homeowner might leave in a driveway or on the floor of a garage—such as a duffel bag and bicycle—and the car failed to stop before hitting them." Consumer Reports' testers also encountered other problems related to difficulties they had remotely stopping the car, which resulted in damage to one of the car's wheels and raised significant safety concerns.[12]

34.     On May 7, 2016, Tesla driver Joshua Brown was killed in Florida when the Autopilot on his Tesla Model S failed to recognize a tractor-trailer crossing in front his car, which resulted in Brown's car striking and passing under the trailer at 74 mph.[13] The top third of Brown's car was sheared off. Brown was a Tesla enthusiast who had previously made videos of himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier.[14] Tesla later publicly

---

[10] Elon Musk, https://twitter.com/elonmusk/status/686279251293777920 (Jan. 10, 2016, 12:11 pm).

[11] Neal Boudette, "Autopilot cited in Death of Chinese Tesla Driver," *The New York Times* (Sept. 14, 2016), *available at* https://www.nytimes.com/2016/09/15/business/fatal-tesla-crash-in-china-involved-autopilot-government-tv-says.html.

[12] Jake Fisher, "Tesla to Fix Self-Parking Feature After Consumer Reports Raises Safety Concern," *Consumer Reports* (Feb. 10, 2016), *available at* https://www.consumerreports.org/car-safety/tesla-fixes-self-parking-feature-after-consumer-reports-raises-safety-concern/.

[13] NTSB, Investigation No. HWY16FH018, Dkt. No. 2, "Crash Summary Report" (June 19, 2017), *available at* https://data.ntsb.gov/Docket/Document/docBLOB?ID=40453253&FileExtension=.PDF&FileName=Crash%20Summary-Master.PDF.

[14] Rachel Abrams & Annalyn Kurtz, "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla," *The New York Times* (July 1, 2016), *available at* https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.

1   stated that the Autopilot software on Brown's car failed to detect the white tractor-trailer because it

2   could not distinguish it from the bright sky. Several months later, in September 2016, Tesla would

3   announce it was confident it had fixed the issue in version 8 of its Autopilot software by increasing

4   the system's reliance on radar so that it "would see a large metal object across the road."[15]

5       35.     Less than a month later, on June 2, 2016, Musk confidently announced that

6   "autonomous driving" was "basically a solved problem," and that Tesla's Autopilot software was

7   already safer than a human driver on highways. "I think we're basically less than two years away

8   from complete autonomy—*complete*," Musk said.[16]

9       36.     On July 14, 2016, Consumer Reports took the unusual step of publicly calling on Tesla

10  to take certain actions. It urged Tesla to "change the name of the Autopilot feature because it

11  promotes a potentially dangerous assumption that the Model S is capable of driving on its own."

12  Instead of using the "misleading" name Autopilot, Consumer Reports urged Tesla to "name

13  automated features with descriptive, not exaggerated, titles."[17]

14      37.     On July 20, 2016, Tesla's official blog published a post by Musk, in which he

15  misleadingly suggests that lack of regulatory approval was a major challenge Tesla was facing in

16  bringing to market fully self-driving vehicles: "When true self-driving is approved by regulators, it

17  will mean that you will be able to summon your Tesla from pretty much anywhere. Once it picks you

18  up, you will be able to sleep, read or do anything else enroute to your destination. You will also be

19  able to add your car to the Tesla shared fleet just by tapping a button on the Tesla phone app and have

20  it generate income for you while you're at work or on vacation."[18]

21

22

---

23  [15] Neal Boudette, "Elon Musk Says Pending Tesla Updates Could Have Prevented Fatal Crash," *The New York Times* (Sept. 11, 2016), *available at* https://www.nytimes.com/2016/09/12/business/elon-musk-says-pending-tesla-updates-could-have-prevented-fatal-crash.html.

24

25  [16] Recode, "Elon Mush | Full Interview | Code Conference 2016," https://www.youtube.com/watch?v=wsixsRI-Sz4&t=4675s at 1:17:55–1:21:20 (June 2, 2016).

26  [17] Consumer Reports, "Consumer Reports Calls on Tesla to Disable and Update Auto Steering Function, Remove 'Autopilot' Name" (July 14, 2016), *available at* https://www.consumerreports.org/media-room/press-releases/2016/07/consumer-reports-calls-on-tesla-to-disable-and-update-auto-steering-function-remove-autopilot-name/.

27

28  [18] Elon Musk, "Master Plan, Part Deux," https://www.tesla.com/blog/master-plan-part-deux (July 20, 2016).

CLASS ACTION COMPLAINT                                                                11

38.     In August 2016, after a Tesla driver with Autopilot engaged crashed into a parked vehicle on a Beijing highway and later stated publicly that Tesla had misrepresented Autopilot's capabilities and misled buyers, Tesla removed from its China website a term that translates as "self-driving" and replaced it with a term that translates as "self-assisted driving."[19] Tesla did not make any similar changes to its U.S. website.

39.     On or about October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system." The German government also reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely operated with, constant driver attention and supervision.[20]

C.     **Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability"**

40.     On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all new Tesla cars would come with a new suite of hardware (called Autopilot Hardware 2) comprising eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would allow the cars to soon become capable of SAE Level 5 autonomy.[21] To access the hardware, owners would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided drivers most or all of the features in the FSD package, except for the right to unlimited access to Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates Tesla might release on its way perfecting that technology.

41.     As part of the announcement, Tesla published on its official blog a post titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," stating "[w]e are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have

---

[19] Jake Spring & Alexandria Sage, "Tesla removes 'self-driving' from China website after Beijing crash," *Reuters* (Aug. 15, 2016), https://www.reuters.com/article/us-tesla-china-crash-idUSKCN10Q0L4.

[20] Reuters Staff, "Germany says Tesla should not use 'Autopilot' in advertising," *Reuters* (Oct 16, 2016), *available at* https://www.reuters.com/article/idUSKBN12G0KS.

[21] *See* Alex Nishimoto, "All New Tesla Models Will Feature Level 5-Capable Autopilot Hardware," *Motor Trend* (Oct. 20, 2016), *available at* https://www.motortrend.com/news/new-tesla-models-will-feature-level-5-capable-autopilot-hardware/.

the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver." In the same post, Tesla stated that "[s]elf-driving vehicles will play a crucial role in improving transportation safety and accelerating the world's transition to a sustainable future," and that "[f]ull autonomy will enable a Tesla to be substantially safer than a human driver."[22]

42.     The blog post included a video made by Tesla's Autopilot team in the weeks before the release, which purported to show a Tesla driving itself without any human intervention from the person in the driver's seat, whose hands remain off the steering wheel throughout the video. The video begins with a note saying, "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." However, multiple Tesla Autopilot employees who worked on the video would later report that the route taken by the car had been charted ahead of time by software that created a three-dimensional digital map (a feature unavailable to drivers using the commercial version of Autopilot), and that the video did not accurately show how the car operated during filming. For example, the car kept executing driving tasks poorly and engineers had to run the pre-programmed route over and over again to get video that would make it appear the car capable of driving itself. At one point during filming, the car crashed into a fence while on Autopilot and had to be repaired.[23] None of these facts were referenced in the video or otherwise disclosed by Tesla. The deceptive and misleading video was later used to promote Autopilot's purported abilities, and indeed is still featured on the company's website despite having been debunked for years.[24]

43.     Also on October 19, 2016, the company held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self-driving"—not a technical term but one that suggests truly autonomous operation. Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next

---

[22] The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct. 19, 2016).
[23] *See* Metz & Boudette, *supra* note 10.
[24] *See* Tesla, https://wwwa.tesla.com/autopilot; Tesla, "Tesla Self-Driving Demonstration," https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long (Nov. 18, 2016).

year without the need for a single touch."[25] Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing people" if they wrote negative articles about self-driving technology that dissuaded people from using it.[26]

44.     According to reporting by multiple outlets, including The Wall Street Journal and The New York Times, Tesla's decision to promise the technology would be able to provide "Full Self-Driving" and Musk's statements at the news conference "took the Tesla engineering team by surprise, and some felt that Musk was promising something that was not possible." Sterling Anderson, who was the head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing teams that they should not refer to the company's technology as 'autonomous' or 'self-driving' because this would mislead the public."[27] In a meeting after the October announcement, someone asked Mr. Anderson how Tesla could brand the product "Full Self-Driving," to which he responded, "This was Elon's decision." Two months later, in December 2016, Mr. Anderson resigned.[28]

45.     On October 20, 2016, the day after the release of Enhanced Autopilot and FSD, Musk tweeted that Tesla's "Summon" feature was capable of autonomously driving itself to pick up its owner "even if you are on the other side of the country."[29]

**D.     Tesla's Continued Failure to Deliver on Its Promise of a Fully Self-Driving Car**

46.     In March 2018, Apple engineer Walter Huang was killed when the Autopilot on his Tesla Model X became confused at a fork in the highway and caused the car to veer sharply to the left and crash into a concrete barrier in Mountain View, California.

47.     In the aftermath of that fatal crash, Tesla publicly released crash data and sought to blame Huang for the accident, violating its agreement with NTSB not to comment on crashes during the course of an investigation, and causing NTSB to remove Tesla as a party to its investigation.

---

[25] Xautoworld, "Transcript: Elon Musk's Autopilot 2.0 Conference Call," https://www.xautoworld.com/tesla/ transcript-elon-musk-autopilot-2-conference-call/ (Oct. 19, 2016).
[26] Kosoff, *supra* note 4; Andrew Batiuk, "Tesla October 19th 2016 Autopilot 2.0 Conference Call With Visuals Added," https://www.youtube.com/watch?v=-vjGEEF_p5E (Oct. 20, 2016).
[27] Metz & Boudette, *supra* note 10.
[28] Dugan & Spector, *supra* note 12.
[29] Elon Musk, https://twitter.com/elonmusk/status/789022017311735808 (Oct. 20, 2016, 1:34 am).

48.     In April 2018, a Tesla with Autopilot engaged struck and killed a pedestrian in Japan.

49.     In September 2018, Musk sent a series of tweets regarding Tesla's stock price and his purported plans to take the company private that the U.S. Securities and Exchange Commission ("SEC") labeled "misleading." The SEC filed a lawsuit against Tesla and Musk, who settled two days later. Under the settlement, Tesla and Musk agreed to pay $40 million in penalties, Tesla agreed to oversee Musk's communications, and Musk was forced to step down as Tesla's chairman (though he would remain as CEO). Musk would later send at least two tweets that violated the terms of the settlement.

50.     In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida. The Banner accident were eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer, and that led Tesla to announce in September 2016 that the company was confident it had fixed the issue by increasing the software's reliance on radar. The Banner accident indicated that Tesla had not fixed this significant flaw in its ADAS technology in September 2016, and still had not done so two-and-a-half years later.

51.     In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and announced that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, and that in two years the company would be making cars without steering wheels or pedals.[30] Musk also stated, "If you fast forward a year, maybe a year and three months, but next year for sure, we will have over a million robo-taxis on the road," and "I feel very confident predicting autonomous robo-taxis for Tesla next year. … I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk stated the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.[31] A few months later,

---

[30] R. Baldwin, "Tesla promises 'one million robo-taxis' in 2020," https://www.engadget.com/2019-04-22-tesla-elon-musk-self-driving-robo-taxi.html (Apr. 22, 2019).

[31] Tech Insider, "Watch Elon Musk Unveil Plans For A Tesla Ride-Hailing App," https://www.youtube.com/watch?v=YiWbdZ8ItRs (Apr. 22, 2019); Matt McFarland, "Elon Musk says

Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020."[32] Tesla has never developed a robo-taxi and is nowhere near doing so.

52.    In May 2019, Tesla released an update to its ADAS "Navigate" feature, which is designed to automate some lane-change functions. When Consumer Reports tested the feature, it found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and sometimes struggled to merge into traffic.[33]

53.    In October 2019, Consumer Reports tested Tesla's "Smart Summon" feature, which Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive itself across a parking lot without any occupants inside the vehicle. Consumer Reports' testing revealed that the feature had difficulty negotiating a parking lot, with the summoned car crossing lane lines and wandering erratically "like a drunken or distracted driver."[34] This was nearly four years after Musk's January 2016 tweet that Tesla was two years away from its customers being able to use Summon to have their car come to them even if it was thousands of miles away.[35]

54.    In December 2019, Jenna Monet was killed when the Model 3 she was in crashed into the back of a parked fire truck in Indiana while Autopilot was engaged.

55.    In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot, citing the high number of Autopilot-related collisions and deaths.

56.    In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off a highway while Autopilot was active.

57.    In September 2020, Consumer Reports published the first in a series of evaluations of Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs,

---

Tesla will have robo-taxis operating next year," *CNN Business*, https://www.cnn.com/2019/04/22/tech/tesla-robotaxis (Apr. 22, 2019).

[32] Elon Musk, https://twitter.com/elonmusk/status/1148070210412265473 (July 7, 2019, 8:24 pm).

[33] *See* Keith Barry, "Tesla's Updated Navigate on Autopilot Requires Significant Driver Intervention," *Consumer Reports* (May 22, 2019), *available at* https://www.consumerreports.org/autonomous-driving/tesla-navigate-on-autopilot-automatic-lane-change-requires-significant-driver-intervention/.

[34] Jeff Plungis, "Tesla's Smart Summon Performance Doesn't Match Marketing Hype," *Consumer Reports* (Oct. 8, 2019), *available at* https://www.consumerreports.org/automotive-technology/teslas-smart-summon-performance-doesnt-match-marketing-hype/.

[35] Musk, *supra* notes 14, 33.

slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while going around a traffic circle.[36]

58.   On November 20, 2020, Tesla attorneys sent the California Department of Motor Vehicles ("DMV") a letter (later released via a Public Records Act request) in response to the DMV's questions about the FSD "City Streets" feature that was about to be released to some Tesla owners in a software update. Tesla's legal counsel wrote, "For context, as we've previously discussed, City Streets continues to firmly root the vehicle in SAE Level 2 capability." The letter goes on to explain in detail FSD's limitations and to admit that the system is nowhere near being fully autonomous or fully self-driving:

> City Streets' capabilities with respect to the object and event detection and response (OEDR) sub-task are limited, as there are circumstances and events to which the system is not capable of recognizing or responding. These include static objects and road debris, emergency vehicles, construction zones, large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather, complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must supervise the system, monitoring both the driving environment and the functioning of City Streets, and he is responsible for responding to inappropriate actions taken by the system. The feature is not designed such that a driver can rely on an alert to draw his attention to a situation requiring response. There are scenarios or situations where an intervention from the driver is required but the system will not alert the driver. In the case of City Streets (and all other existing FSD features), because the vehicle is not capable of performing the entire DDT, a human driver must participate ....[37]

59.   On December 14, 2020, in another letter to the California DMV (released via a Public Records Act request), Tesla's legal counsel reiterated that any final release of the FSD City Streets feature to the Tesla customer fleet "will continue to be an SAE Level 2, advanced driver-assistance

---

[36] *See* Mike Monticello & Keith Barry, "Tesla's 'Full Self-Driving Capability' Falls Short of Its Name: The pricey option doesn't make the car self-driving, and now Tesla's promises are under scrutiny by state regulators in California," *Consumer Reports* (Sept. 4, 2020) (last updated May 19, 2021), *available at* https://www.consumerreports.org/autonomous-driving/tesla-full- self-driving- capability-review-falls-short-of-its-name-a1224795690/.

[37] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 1 (Nov. 20, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.

feature" that, like all other FSD features, "do[es] not make the vehicle autonomous" and is "intended for use only with a fully attentive driver who has his or her hands on the wheel and is prepared to take over at any moment." Tesla's counsel continued, "Please note that Tesla's development of true autonomous features (SAE Levels 3+) … will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals."[38]

60. On December 28, 2020, in another letter to the California DMV (released via a Public Records Act request), Tesla's legal counsel again reiterated the SAE Level 2 nature and limitations of Tesla's FSD technology:

> Full Self-Driving (FSD) Capability is an additional optional suite of features that builds from Autopilot and is also representative of SAE L2. Features that comprise FSD Capability are Navigate on Autopilot, Auto Lane Change, Autopark, Summon, Smart Summon, Traffic and Stop Sign Control, and, upcoming, Autosteer on City Streets (City Streets). While we designed these features to become more capable over time through over-the-air software updates, currently neither Autopilot nor FSD Capability is an autonomous system, and currently no comprising feature, whether singularly or collectively, is autonomous or makes our vehicles autonomous. This includes the limited pilot release of City Streets.[39]

61. During the same month that Tesla's legal team was assuring California regulators that the most advanced version of its ADAS technology was still at SAE Level 2 and suggesting it was likely to remain at Level 2 for the foreseeable future, Elon Musk gave an interview to Business Insider in which he promised that Tesla would achieve Level 5 before the end of the following year,

---

[38] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 2-3 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.

[39] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: Autonomous Mode Disengagements for Reporting Year 2020 at 1-2 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/; *see also* David Silver, "Tesla Emails To The California DMV Emphasize Continued Reliance On Maps," *Forbes* (Mar. 9, 2021), *available at* https://www.forbes.com/sites/davidsilver/2021/03/09/tesla-emails-to-the-california-dmv-emphasize-continued-reliance-on-maps/?sh=2c0884c957e6.

1  stating "I'm extremely confident that Tesla will have level five next year, extremely confident,

2  100%."[40]

3       62.    In January 2021, Tesla reported $721 million in profit in 2020, its first profitable year.

4  This was a dramatic turnaround in the company's financial condition from prior recent years. As

5  recently as 2018, Tesla had been burning through cash, was in danger of running out of money, and at

6  one point was approximately only one month away from having to declare bankruptcy.[41]

7       63.    In a January 2021 earnings call, Musk stated that the company had made "massive

8  progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla Autopilot

9  is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the

10 reliability in excess of a human this year. This is a very big deal." When a financial analyst asked

11 Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded,

12 "I'm confident based on my understanding of the technical roadmap and the progress that we're

13 making between each beta iteration."[42]

14      64.    Six weeks later on a March 9, 2021 phone call with California DMV regulators,

15 Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV

16 memo memorializing the call (released via a Public Records Act request), "DMV asked CJ to address,

17 from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the

18 year. Elon's tweet does not match engineering reality per CJ." (It appears that the DMV tried but

19 failed to redact that last sentence.) In response to a question from DMV regulators about "how Tesla

20 evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are

21 still firmly in L2 [Level 2]." Tesla further told the DMV that "[t]he ratio of driver interaction would

22 need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of

23

24 ────────────────

[40] Mathias Döpfner, "Elon Musk reveals Tesla's plan to be at the forefront of a self-driving-car
25 revolution," *Business Insider*, https://www.businessinsider.com/elon-musk-interview-axel-springer-
   tesla-accelerate-advent-of-sustainable-energy (Dec. 5, 2020).

26 [41] *See* Chris Isidore, "Tesla just proved all its haters wrong. Here's how," *CNN Business*,
   https://www.cnn.com/2020/01/31/investing/tesla-cash-crunch/index.html (Jan. 31, 2020); Chris
27 Isidore, "Elon Musk: Tesla was month away from bankruptcy," *CNN Business*, https://www.cnn.com/
   2020/11/04/tech/elon-musk-tesla-once-got-near-bankruptcy/index.html (Nov. 4, 2020).

28 [42] Tesla (TSLA) Q4 2020 Earnings Call Transcript (Jan. 27, 2021), *available at*
   https://www.fool.com/earnings/call-transcripts/2021/01/27/tesla-tsla-q4-2020-earnings-call-transcript/.

automation [i.e., Level 3 and higher]."[43] In other words, drivers would need to intervene only once per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software, which routinely makes mistakes, is not even remotely close to this level of reliability.

65.     Following up on the March 9, 2021 phone call, the California DMV wrote to Tesla: "Notwithstanding other public messaging from Tesla about developing vehicles capable of full driving automation, Tesla reiterated that the City Streets feature is currently a Society of Automotive Engineers (SAE) level two (2) Advanced Driver-Assistance feature and that Tesla will continue to monitor how participants interact with the feature and make improvements. As mentioned in your [prior] correspondence and per California regulations, should Tesla develop technology features characterized as SAE level 3 or higher, Tesla will seek the appropriate regulatory permitting from the DMV before autonomous vehicles are operated on public roads."[44]

66.     In May 2021, under pressure from the Transportation Committee of the California Senate, the California Department of Motor Vehicles launched an investigation into whether Tesla is deceptively marketing its ADAS technology as making its cars capable of autonomous driving.[45]

67.     In June 2021, in what was widely seen as a response to motor vehicle collisions involving Tesla's ADAS technology, NHTSA issued an unprecedented order requiring automobile manufacturers to report any crash involving an injury, fatality, or property damage that happens while or immediately after a vehicle is automating some driving tasks.

68.     In early July 2021, Tesla released the FSD Beta 9 version of its FSD software to certain Tesla vehicle owners. Following the release, Tesla owners took videos of the software in action that show vehicles missing turns, scraping against bushes, and veering toward parked cars.

---

[43] Memorandum to File by Miguel Acosta (DMV) Re: Tesla AP City Streets Update (Mar. 9, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.
[44] Letter from Miguel Acosta (DMV) to Eric Williams (Tesla) (Apr. 21, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.
[45] *See* Russ Mitchell, "DMV probing whether Tesla violates state regulations with self-driving claims," *Los Angeles Times* (May 17, 2021), *available at* https://www.latimes.com/business/story/2021-05-17/dmv-tesla-california-ADAS-autopilot-safety.

69.     On July 26, 2021, on a quarterly earnings call, Musk told investors and reporters that he was confident FSD-equipped Tesla vehicles would soon "be able to drive themselves with the safety levels substantially greater than that of the average person."

70.     In August 2021, NHTSA opened a preliminary safety defect investigation into Autopilot, and two U.S. Senators called for the Federal Trade Commission to investigate what they referred to as Tesla's potentially deceptive marketing practices surrounding its FSD technology, including Tesla's use of the phrase "full self-driving" to describe and market a feature that does not make the vehicle fully self-driving.

71.     On August 31, 2021, NHTSA ordered Tesla to produce documents and information regarding the design of its FSD technology, crashes involving that technology, and marketing materials that make representations about that technology. On the date that was the deadline for compliance, Tesla submitted only a partial response to NHTSA, claiming that the documents and information it had requested was confidential business information.

72.     On October 12, 2021, NHTSA asked Tesla about its practice of asking FSD Beta users to sign nondisclosure agreements prohibiting users from sharing negative information about their experiences using the FSD Beta software.

73.     On October 24, 2021, Tesla pulled back the release of version 10.3 of its ADAS software, which the company had already made available for drivers to use on public roads, because of problems the software was having making left turns at traffic lights.

74.     In October 2021, an update to the FSD Beta software caused a major increase in "phantom braking" incidents, in which the software identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software update released on October 25, 2021, but subsequently issued a formal recall over the issue for the more than 11,000 vehicles using the FSD Beta software in a reported effort to head off adverse action by U.S. regulators.[46] Tesla's claims of

---

[46] Tom Krisher, "Tesla software recall may head off fight with US regulators," *Associated Press* (Nov. 2, 2021), *available at* https://apnews.com/article/technology-business-software-d3e2107435f432fd9b36ba14898166a0.

1    having fixed the problem, however, turned out to be false, as driver complaints about "phantom

2    braking" issues soared to 107 NHTSA complaints in the three-month period of November 2021

3    through January 2022 (compared with only 34 such complaints in the preceding 22 months). Owner

4    complaints to NHTSA included everything from phantom braking incidents that were "happening

5    with NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an

6    incident where Tesla software slammed on the brakes in response to a plastic bag.[47]

7           75.    On November 18, 2021, CNN Business reported that it spent a morning testing Tesla's

8    FSD technology on the streets of New York City and "watched the software nearly crash into a

9    construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the

10   road." The FSD software reportedly "needed plenty of human interventions to protect us and

11   everyone else on the road," including a driver intervention "every couple of blocks or so" and

12   multiple instances in which the driver "quickly jerked the wheel to avoid a crash."[48]

13          76.    On December 6, 2021, The New York Times published an article about its

14   investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla

15   employees who had worked on designing, developing, and testing that technology at Tesla over the

16   prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly

17   misled buyers" about the abilities of Tesla's ADAS technology.[49]

18          77.    In January 2022, Musk stated on an earnings call, "My personal guess is that we'll

19   achieve Full Self-Driving this year. I would be shocked if we do not achieve Full Self-Driving safer

20   than a human this year. I would be shocked."

21          78.    On July 13, 2022, the Dawn Project, an organization dedicated to increasing the

22   software safety, published a paper regarding its testing of a Tesla Model 3 equipped with FSD Beta

23

24   [47] Faiz Siddiqui & Jeremy B. Merrill, "Tesla drivers report a surge in 'phantom braking,'" *The Washington Post* (Feb. 2, 2022), *available at* https://www.washingtonpost.com/technology/

25   2022/02/02/tesla-phantom-braking/.

26   [48] Matt McFarland, "We tried Tesla's 'full self-driving.' Here's what happened," *CNN Business*, https://www.cnn.com/2021/11/18/cars/tesla-full-self-driving-brooklyn/index.html (Nov. 18, 2021);

27   *CNN*, "CNN tests a 'full self-driving' Tesla," https://www.youtube.com/watch?v=2PMu7MD9GvI (Nov. 18, 2021).

28   [49] Metz & Boudette, *supra* note 10; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.

10.12.2 (released on June 1, 2022) on a closed racetrack. The purpose of the testing was to determine the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing was performed on a closed racetrack with the Tesla driving itself between a long row of cones with a child-sized mannequin placed in plain view at the end of the row—*i.e.*, conditions significantly less complex and more favorable to the FSD software than those that would be encountered in the real world. Nevertheless, the testing found that Tesla's FSD software consistently failed to detect the stationary child-size mannequins and "d[id] not avoid the child or even slow down," but instead "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."[50]

79.     On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric vehicles, published an article reviewing his experience of using Tesla's FSD Beta software over the course of two months. His ultimate conclusion was that, despite years of development and updates by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes appears to consume hard drugs."[51]

### E.     California DMV Charges Tesla With Engaging in Untrue, Misleading, and Deceptive Marketing of its "Autopilot" and "Full Self-Driving" Technology

80.     On July 28, 2022, following a year-long investigation, the California DMV, which licenses motor vehicle manufacturers and dealerships in California (including Tesla's Fremont factory and dozens of Tesla retail stores), brought two related administrative enforcement actions against Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology. The DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self-Driving Capability," as well as statements about those technologies that have appeared on Tesla's website in 2022, "represent that vehicles equipped with those ADAS [advanced driver assistance system] features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous

---

[50] The Dawn Project, *In Scientific Test, Tesla "Full Self-Driving" Technology Consistently Strikes Child-Sized Mannequins* (July 13, 2022), *available at* https://dawnproject.com/wpcontent/uploads/2022/08/The_Dawn_Project_Tesla_ADAS_Test_8_.pdf.

[51] Fred Lambert, "Elon Musk does the impossible and manages expectations on Tesla's next Full Self-Driving update," *Electrek* (July 14, 2022), https://electrek.co/2022/07/14/elon-musk-manages-expectations-tesla-next-big-full-self-driving-update/.

1    vehicles." For relief, the DMV seeks restitution and the revocation or suspension of Tesla's California

2    vehicle manufacturer license and vehicle dealer license. *See In the Matter of the Accusation Against*

3    *Tesla Inc. dba Tesla Motors, Inc., a Vehicle Manufacturer*, Case No. 21-02188, Accusation (July 28,

4    2022) (attached hereto as **Exhibit A**); *In the Matter of the Accusation Against Tesla Inc. dba Tesla*

5    *Motors, Inc., a Vehicle Dealer*, Case No. 21-02189, Accusation (July 28, 2022) (attached hereto as

6    **Exhibit B**).

7    **V.     CLASS ACTION ALLEGATION**S

8           81.     Plaintiff brings this class action under Federal Rule of Civil Procedure 23, on behalf of

9    himself and all others similarly situated, as a member of a proposed nationwide class and, in the

10   alternative, a proposed California class (collectively, the "Class"), defined as follows:

11              Nationwide Class: All persons who purchased or leased from Tesla, Inc.
12              (or any entity it directly or indirectly owns or controls, including but not
                limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
13              with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
                Capability" (collectively, "Class Vehicles") at any time from January 1,
14              2016, to the present ("Class Period").

15              California Class: All persons who purchased or leased from Tesla, Inc.
16              (or any entity it directly or indirectly owns or controls, including but not
                limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
17              with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
                Capability" (collectively, "Class Vehicles") at any time from January 1,
18              2016, to the present ("Class Period"), and who either purchased or leased
                that vehicle in California or who currently reside in California.
19

20   Excluded from the Class are: Defendants; any entity that Defendants directly or indirectly own or

21   control; Defendants' officers, directors, employees, agents, legal representatives, and attorneys; and

22   the Court and its employees.

23          82.     This action is brought as a class action and may properly be so maintained pursuant to

24   the provisions of Federal Rule of Civil Procedure 23, to amend or modify the Class description with

25   greater specificity or further division into subclasses or limitation to particular issues, based on the

26   results of discovery.

27          83.     **Numerosity**. The members of the Class are so numerous that their individual joinder is

28   impracticable. Defendants sold or leased tens of thousands of Class Vehicles during the Class Period.

CLASS ACTION COMPLAINT                                                                              24

The identities of Class members may be identified through business records regularly maintained by Defendants and their employees, agents, and subsidiaries, and through the media. If necessary, Class members can be notified of this action by e-mail, mail, and supplemental published notice.

84. **Existence and Predominance of Common Questions of Fact and Law**. There are questions of law and fact that are common to the Class. These common questions predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

i. Whether Defendants and their agents (collectively, "Defendants") engaged in the conduct alleged herein;

ii. Whether Defendants' use of the terms "Autopilot," "Enhanced Autopilot," "Full Self-Driving," and "Full Self-Driving Capability" to describe their ADAS technology was false, deceptive, or misleading;

iii. Whether Defendants knew or should have known that their public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

iv. Whether Defendants knew or should have known that their prior public statements regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading, but failed to take steps adequate to correct those prior statements;

v. Whether Defendants knowingly concealed from consumers information that would cause a reasonable consumer to conclude or develop material doubts that Defendants' public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

vi. Whether Defendants' conduct alleged herein violates consumer protection laws;

vii. Whether Defendants' conduct alleged herein violates warranty laws;

viii. Whether Defendants' conduct alleged herein violates any other laws set forth below in the Claims for Relief;

ix.  Whether Defendants' conduct alleged herein actually and proximately caused Plaintiff and Class members to suffer legally cognizable harm; and

x.  Whether Plaintiff and Class members are entitled to declaratory relief, injunctive relief, restitution, damages, or any other relief requested herein.

85.  **Typicality**. Plaintiff's claims are typical of the other Class members' claims because Defendants' wrongful acts and omissions alleged herein were substantially the same with respect to Plaintiff and all other Class members, Defendants' wrongful acts and omissions alleged herein caused Plaintiff and all other Class members comparable injury, Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff.

86.  **Adequacy of Representation**. Plaintiff can fairly and adequately represent and protect the interests of all other Class members. There are no material conflicts between the interests of Plaintiff and the other Class members that would make certification of the Class inappropriate. Plaintiff has retained competent and qualified counsel that has extensive experience in complex litigation and class action litigation, and that will vigorously prosecute the claims of Plaintiff and all other Class members.

87.  This action is properly maintained as a class action under Federal Rule of Civil Procedure 23 for the following reasons:

a.  **Class Action Status:** Class action status is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by each of the thousands of Class members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class members. Class action status is also appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by Class members would create a risk of adjudication with respect to individual Class members that, as a practical matter, would be dispositive of other Class members' interests or would substantially impair or impede their ability to protect their interests.

b.  **Declaratory and Injunctive Relief:** Certification under Federal Rule of Civil Procedure 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that

apply generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c.   **Predominance and Superiority:** Certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy, including consideration of (i) the relatively limited interests of Class members in individually controlling the prosecution of separate actions; (ii) the limited extent and nature of any litigation concerning this controversy already begun by Class members; (iii) the desirability of concentrating the litigation of the claims in this forum; and (iv) the relatively minor difficulties likely to arise in managing the proposed class action. Class action treatment is superior here because the monetary harms suffered by individual Class members are small compared to the burden and expense of bringing and prosecuting individual actions against Defendants to address their complex misconduct against the consuming public. Individualized litigation also presents a potential for inconsistent or contradictory judgments, would increase the delay and expense to all parties and the court system due to the complex legal and factual issues involved in this controversy, and would make it virtually impossible for individual Class members to redress effectively the harm done to them by Defendants. By contrast, a class action allows for the adjudication of a significant number of claims that would otherwise go unaddressed because of the significant practical difficulties and relative expense of bringing and maintaining an individual action. A class action also provides economies of scale and other significant potential benefits that can be realized only by resolving this controversy in a single adjudication with comprehensive supervision by a single court.

88.   **Issue Certification:** Certification of particular issues in this action, including issues of liability and relief sought, is appropriate under Federal Rule of Civil Procedure 23(c)(4) because these issues are common to all Class members, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

89.     The Class is ascertainable from Defendants' own records, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated by Defendants in the same or similar fashion.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM
Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, *et seq.*

90.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

91.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited to any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

92.     Defendants' wrongful acts and omissions alleged herein were and are unlawful, unfair, and fraudulent business acts and practices in violation of the UCL. Defendants' wrongful acts and omissions alleged herein were and are likely to deceive the consuming public in California and throughout the U.S. regarding the abilities, limitations, and value of Tesla's ADAS packages and technology. Defendants' wrongful acts and omissions alleged herein also constitute deception, fraud, and misrepresentation, and concealment, suppression, and omission of material facts in the context of consumer transactions with Plaintiff and Class members.

93.     Defendants knew or should have known that their wrongful acts and omissions alleged herein were likely to deceive the consuming public in California and the rest of the U.S., and Defendants committed those acts and omissions anyway for their own financial gain, including by shoring up and otherwise improving their financial condition, avoiding bankruptcy, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the value of Tesla (including by increasing its share price).

94.     Defendants' "unfair" business acts and practices under the UCL include, among other things, Defendants' acts, omissions, and conduct in: (a) marketing and referring to Tesla's ADAS

packages and technology as "Autopilot," "Full Self-Driving," and "Full Self-Driving Capability"; (b) providing information about the capabilities, limitations, and value of Tesla's ADAS packages and technology to the consuming public that is materially different from the information Defendants contemporaneously provided to regulators, especially when provided in a non-public way or in a way not contemporaneously available to the public (*e.g.*, a FOIA or Public Records Act request is required to obtain the information); (c) marketing Tesla's ADAS packages and technology in a way that largely or entirely focuses on its actual or purported abilities in forums likely to generate significant public attention or otherwise reach a relatively large number of relevant consumers (*e.g.*, Musk's Twitter feed, interviews with high-distribution or otherwise influential media, news conferences and other public events likely to generate media coverage, pages on the Tesla website that potential Tesla customers are more likely to visit than other pages on the website and have a relatively high number of views compared to other pages on the website), while relegating information about the ADAS packages and technology's flaws and limitations to forums likely to generate little public attention or otherwise reach a relatively small number of relevant consumers (*e.g.*, pages on the Tesla website that potential Tesla customers are unlikely to visit relative to other pages on the website, vehicle user manuals, regulatory filings); (d) misrepresenting or otherwise providing information likely to deceive the public regarding the then-existing abilities and limitations of Tesla's ADAS packages and technology, including versions of that technology then available to some or all eligible Tesla owners, as well as versions of that technology represented as being in the possession of Defendants but not yet available to some or all eligible Tesla owners; (e) misrepresenting or otherwise providing information likely to deceive the public regarding misrepresenting the likely future abilities and limitations of Tesla's ADAS packages and technology and the time periods in which those future abilities would likely be achieved and the future limitations likely reduced or eliminated; and (f) otherwise disseminating, not disseminating, or causing to be disseminated or not be disseminated to the consuming public information likely to deceive the consuming public in California and the rest of the U.S.

95.    Defendants' acts, omissions, and conduct alleged herein were and are "unfair" under the UCL because they are offensive to public policy and constitute immoral, unethical, oppressive,

1   and unscrupulous activities that caused and continue to cause substantial injury to the consuming

2   public, including Plaintiff and Class members. The harm caused by Defendants' conduct greatly

3   outweighs any countervailing benefits to consumers or competition.

4         96.     Defendants have engaged in "unlawful" business acts and practices by, as set forth in

5   this Complaint, violating the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; violating the

6   California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; violating the California

7   Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; and violating their common law

8   obligations.

9         97.     Defendants have further engaged in "unlawful" business acts and practices by

10   (a) committing "unfair or deceptive acts or practices in or affecting commerce" in violation of 15

11   U.S.C. § 45; (b) "mak[ing] or disseminat[ing], or caus[ing] to be made or disseminated, before the

12   public in this state … a statement that is untrue or misleading and that is known, or that by the

13   exercise of reasonable care should be known, to be untrue or misleading," in violation of Cal. Vehicle

14   Code § 11713(a); (c) "mak[ing] or disseminat[ing], or caus[ing] to be so disseminated, a statement as

15   part of a plan or scheme with the intent not to sell a vehicle or service … as so advertised," in

16   violation of Cal. Vehicle Code § 11713(a); (d) making "advertised statements, representations, or

17   offers [] in connection with the sale or attempted sale of any vehicle(s)" that is not "clearly set forth,"

18   "based on facts," or otherwise violates the Vehicle Code or Title 13, Division 1, Chapter 1 of the

19   California Code of Regulations, in violation of 13 Cal. Code Regs. § 260.00; (e) violating other

20   "provision[s] of Article 1 (commencing with Section 11700) of, or Article 1.1 (commencing with

21   Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto," as

22   referenced in Cal. Vehicle Code § 11705(a)(10); and (f) causing Plaintiff and all other Class members

23   to suffer "loss or damage by reason of any fraud or deceit practiced on that person or fraudulent

24   representations made to that person" within the meaning of Cal. Vehicle Code § 11705(a)(14).

25         98.     Defendants have engaged in "fraudulent" business acts and practices for all the same

26   reasons set forth in Plaintiff's Claim for Relief for Fraud and Deceit set forth herein, each and every

27   allegation of which Plaintiff hereby re-alleges and incorporates by reference, as though fully set forth

28   in this Claim for Relief.

CLASS ACTION COMPLAINT                                                         30

99.     Defendants' wrongful conduct and the harm it has caused, and continues to cause, was and is not reasonably avoidable by Plaintiff, Class members, or the consuming public. At all relevant times, Defendants knew or should have known that Plaintiff and Class members would not have reasonably known or discovered that so many of Defendants' misrepresentations regarding the capabilities, limitations, and value of Tesla's ADAS packages and technology were false, deceptive, or misleading.

100.     Defendants' false, deceptive, or misleading representations regarding the capabilities, limitations, and value of Tesla's ADAS packages and technology were material, and Plaintiff's and Class members' reasonable reliance on the truth and accuracy of those material misrepresentations was a substantial factor in influencing Plaintiff and Class members to purchase or lease Class Vehicles and ADAS packages from Defendants.

101.     As a direct and proximate result of Defendants' wrongful conduct, Defendants (a) have received and will continue to receive revenue, profits, and other benefits that it would not have received if it had not engaged in conduct violating the UCL as alleged herein, and (b) have obtained, and will continue to obtain, an unfair advantage over similar businesses that represent their goods and services in a manner that either does not violate the UCL, or that violates the UCL to a lesser extent than Defendants.

102.     As a direct and proximate cause of Defendants' UCL violations, Plaintiff and other Class members have each suffered a monetary injury because they each paid Tesla money for a good or service (*i.e.*, a vehicle with full self-driving capability) that Tesla has never provided, Defendants have and continue to wrongfully retain those monies paid by Plaintiff and Class members.

103.     Unless Defendants are enjoined from engaging in conduct alleged herein that violates the UCL, members of the consuming public will be further harmed by that conduct.

104.     As a result of Defendants' UCL violations and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in their past and ongoing acts, omissions, and conduct that violate the UCL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants to add ADAS packages to their Class Vehicle and that

1   Defendants continue to wrongfully retain, including any diminished value of Plaintiff's and Class

2   members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived

3   from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Civ. Proc. Code

4   § 1021.5 and any other applicable law; and (d) all other relief prayed for below.

5          WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

6                                   **SECOND CLAIM**
                          Violation of the California False Advertising Law
7                           Cal. Bus. & Prof. Code § 17500, *et seq.*

8          105.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth

9   above, as though fully set forth in this Claim for Relief.

10         106.   Defendants' conduct alleged herein violates California's False Advertising Law

11  ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, which makes it unlawful for a business to make,

12  disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal

13  property … which is untrue or misleading, and which is known, or which by the exercise of

14  reasonable care should be known, to be untrue or misleading." *Id.* § 17500.

15         107.   The Class Vehicles and ADAS packages (including all ADAS hardware, software, and

16  rights to receive updates and use the same) are "personal property" within the meaning of the FAL.

17         108.   Any express or implied representation, material omission of information, or failure to

18  correct a past material misrepresentation or omission regarding the abilities, limitations, or value of

19  the Class Vehicles and ADAS packages and technology is a "statement[] concerning personal

20  property" within the meaning of the FAL.

21         109.   Defendants violated the FAL by making, disseminating, and causing to be made or

22  disseminated to the public statements about the abilities, limitations, flaws, and value of Tesla's

23  ADAS packages and technology that were "untrue or misleading" within the meaning of the FAL.

24         110.   Defendants made, disseminated, or caused to be made or disseminated such public

25  statements in numerous forums, including but not limited to Tesla's blog and website, Musk's Twitter

26  account, earnings calls and other public statements to investors, conferences and other public events,

27  television, radio, podcasts, and other publicly available media (whether print, video, audio, or other

28  format) that republished such representations and omissions.

CLASS ACTION COMPLAINT                                                                    32

111.    Defendants knew or, by the exercise of reasonable care, should have known about each of those statements at or near the time they were made or disseminated, and at all times thereafter.

112.    Defendants knew or, by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

113.    Unless Defendants are enjoined from engaging in the conduct alleged herein that violates the FAL, members of the consuming public will be further harmed by that conduct.

114.    As result of Defendants' FAL violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Tesla from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for the purchase or lease of Class Vehicles and ADAS packages, which Defendants continue to wrongfully retain, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Civ. Proc. Code § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## THIRD CLAIM
Violation of the California Consumers Legal Remedies Act
Cal. Civ. Code § 1750, *et seq.*

115.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

116.    The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or service to any consumer." *Id.* § 1770(a).

117.    Each Defendant is a "person" under the CLRA. *See id.* § 1761(c).

118.    Plaintiff and all Class members are "consumers" under the CLRA because they are all individuals who acquired, by purchase or lease, Class Vehicles and ADAS packages for personal, family, or household purposes. *See id.* § 1761(d).

119.    The purchase or lease of a Class Vehicle and/or ADAS package is a "transaction" under the CLRA. *See id.* § 1761(e).

120.    Class Vehicles and ADAS packages are "goods" under the CLRA. *See id.* § 1761(a).

121.    In selling or leasing Class Vehicles and ADAS packages to Plaintiff and Class members, Defendants made an express or implied promise to provide future ADAS software development, future ADAS software updates, and other work or labor that constitutes "services" under the CLRA. *See id.* § 1761(b).

122.    Defendants' wrongful acts, practices, and conduct alleged herein—including but not limited to their false, misleading, and deceptive marketing, representations, and omissions regarding the present and likely future abilities, limitations, flaws, and value of Class Vehicles and ADAS packages and technology, and the time periods in which Tesla's ADAS packages and technology would result in a fully self-driving vehicle—are "unfair or deceptive acts or practices" in violation of the CLRA. *Id.* § 1770(a).

123.    "Unfair or deceptive acts or practices" in violation of the CLRA include but are not limited to: (a) representing that goods or services have characteristics, ingredients, uses, or benefits that they do not have, *id.* § 1770(a)(5); (b) representing that goods or services are of a particular standard or quality, or that goods are of a particular style or model, if they are of another, *id.* § 1770(a)(7); (c) advertising goods or services with intent not to sell or lease them as advertised, *id.* § 1770(a)(9); and (d) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, *id.* § 1770(a)(16).

124.    Defendants committed these unfair or deceptive acts or practices when they sold or leased Class Vehicles and ADAS packages to Plaintiff and Class members that did not have the represented characteristics, uses, and benefits; were not of the represented quality; were not sold or leased as advertised; did not perform as advertised; and were materially worse, less capable, less safe, and less valuable than Defendants had represented, and continued to represent them, to be.

125.    Defendants knowingly and intentionally committed these unfair or deceptive acts or practices.

126.    A reasonable consumer would consider knowing the reasons why Defendants' representations were unfair or deceptive to be material and important in deciding whether to purchase or lease a Class Vehicle, and whether to pay additional money above the vehicle's base price for an ADAS package.

127.    Defendants' unfair or deceptive acts or practices materially affected Plaintiff's and Class members' purchasing or leasing decisions. Defendants' false, misleading, and deceptive marketing, representations, and omissions regarding Class Vehicles and ADAS packages and technology were a substantial factor in Plaintiff's and Class members' decisions to purchase or lease Class Vehicles, and their decisions to pay thousands of dollars above the vehicle's base price for an ADAS package.

128.    In accordance with Cal. Civ. Code § 1780(d), Plaintiff's CLRA venue declaration is attached hereto as **Exhibit C**.

129.    Unless Defendants are enjoined from engaging in the conduct alleged herein that violates the CLRA, members of the consuming public will be further harmed by that conduct.

130.    As a result of Defendants' CLRA violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in their past and ongoing acts, omissions, and conduct that violate the CLRA; (b) an award of reasonable attorneys' fees under Cal. Civ. Code § 1780(e), Cal. Civ. Proc. Code § 1021.5, and any other applicable law; and (c) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### FOURTH CLAIM
Violation of the Magnuson-Moss Warranty Act
15 U.S.C. § 2301, *et seq.*

131.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

132.    The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, provides a cause of action for any consumer damaged by the failures of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

133.    The Class Vehicles and the ADAS packages on those vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

134.    Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

135.    Defendants are each a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

136.    Under 15 U.S.C. § 2310(e), Plaintiff and the Class are not required to provide Defendants notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiff under Rule 23.

137.    Defendants and their representatives and agents' representations on Tesla's website, Twitter, Tesla marketing materials, and various other media that the Class Vehicles already were or would soon become fully self-driving cars are each written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

138.    Through written and implied warranties, Defendants warranted that the Class Vehicles and the ADAS packages and technology on those vehicles (both as sold or leased, and as periodically updated thereafter) are free from defects, of merchantable quality, and fit for their ordinary and represented use.

139.    Defendants breached their written and implied warranties as described herein. Plaintiff and Class members were lured into purchasing or leasing Class Vehicles with ADAS packages and technology by Tesla's misrepresentations that it already had developed, or would soon complete its development of, ADAS packages and technology capable of making the Class Vehicles fully self-driving. Instead, the Class Vehicles and ADAS packages and technology purchased or leased by Plaintiff and Class members do not perform as promised, are not free of defects, are not of merchantability quality, and are unfit for their ordinary and represented use.

140.    Defendants knew or should have known that they were making express and implied warranties that they would not be able to keep regarding the current and future near-term abilities, limitations, and value of Tesla's ADAS packages and technology, and knew or should have known that Tesla's ADAS packages and technology would not perform as promised, were not free of defects, were not of merchantability quality, and were unfit for their ordinary and represented use. Nevertheless, Defendants repeatedly promised in highly public and sensational ways intended to attract media attention and consumer interest in Tesla's vehicles and ADAS packages and technology that its vehicles already were or would very shortly be fully self-driving.

141.    Plaintiff and Class members were damaged as a result of Defendants' breaches of their warranties because they received Class Vehicles and ADAS packages incapable of performing as Defendants represented, rendering the Class Vehicles and ADAS packages significantly less valuable than represented.

142.    For relief, Plaintiff and the Class are entitled to and seek (a) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of the price that Plaintiff and Class members paid Defendants for ADAS packages and/or the difference between the price paid for the Class Vehicles as warranted and the actual value of the Class Vehicles as delivered) and all other available damages; (b) reasonable attorneys' fees and costs, and (c) all other available relief sought herein.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## FIFTH CLAIM
Breach of Express Warranty
Cal. Civ. Code §§ 1791.2(a), 1794

143.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

144.    Defendants expressly warranted to Plaintiff and Class members through written statements within the meaning of Cal. Civ. Code § 1791.2(a)(1) (including but not limited to statements that Defendants made or caused to be made on Tesla's website, in Tesla marketing materials, on Musk's Twitter account, in various print media, and other written forums) that the Class

Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

145. Defendants also expressly warranted to Plaintiff and Class members through use of the samples and models within the meaning of Cal. Civ. Code § 1791.2(a)(2) (including but not limited to videos Defendants produced purporting to show Tesla vehicles driving themselves) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

146. The Class Vehicles and ADAS packages that Plaintiff and Class members purchased or leased: were not as warranted when they left Tesla's factories, reached Plaintiff and Class members without substantial change in the condition in which they were sold or leased, and did not perform as warranted.

147. Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

148. As a direct and proximate result of these breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value than represented; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiff, Class members, and the public.

149. The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiff's and Class members' harm, which includes the difference between the prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

150. For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public

1  regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology;

2  (b) damages caused by Defendants' breaches of the warranties, including economic damages (based

3  on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and

4  ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

5  packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

6  (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (d) reasonable

7  attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (e) all other

8  available relief sought herein.

9        WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

10                         **SIXTH CLAIM**
                   Breach of Implied Warranties
11              Cal. Civ. Code §§ 1791.1, 1792, 1794

12        151.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

13  above, as though fully set forth in this Claim for Relief.

14        152.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*,

15  every sale or lease of consumer goods to a retail buyer is accompanied by an implied warranty of

16  merchantability from both the manufacturer and the retail seller or lessor, and some such sales and

17  leases may be also be accompanied by an implied warranty of fitness from both the manufacturer and

18  the retail seller or lessor. *Id.* § 1792-1792.2.

19        153.    The durations of these implied warranties are coextensive with the duration of the

20  Defendants' express warranty, provided the duration of the express warranty is reasonable, except

21  that the duration of the implied warranties cannot have a duration of less than 60 days or more than

22  one year. *Id.* § 1791.1(c).

23        154.    Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class

24  members was accompanied by Defendants' implied warranty of merchantability, both in their

25  capacities as manufacturer and as retail seller or lessor. *Id.* § 1792.

26        155.    Defendants' implied warranties of merchantability include warranties that the Class

27  Vehicles and ADAS packages (1) will pass without objection in the trade under the contract

28  description, (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately

1   contained, packaged, and labelled, and (4) will conform to the promises or affirmations of fact made

2   on the container or label. *Id.* § 1791.1(a).

3   156.   At the time of purchase or lease, or within one year thereafter, the Class Vehicles and

4   ADAS packages and technology failed to conform with Defendants' implied warranty of

5   merchantability because they (1) did not pass without objection in the trade under the contract

6   description, (2) were not fit for the ordinary purposes for which such goods are used, (3) were not

7   adequately contained, packaged, and labelled, and (4) did not conform to the promises or affirmations

8   of fact made on the container or label. Among other things, the Class Vehicles and ADAS packages

9   did not conform to the promises contained in the labels "Autopilot," "Enhanced Autopilot," and "Full

10  Self-Driving Capability."

11  157.   Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class

12  members was also accompanied by Defendants' implied warranty of fitness, both in their capacities

13  as manufacturer and as retail seller or lessor. *Id.* § 1792.

14  158.   At the time that Plaintiff and Class members purchased or leased their Class Vehicles

15  and ADAS packages from Defendants, Defendants were in the business of designing, developing,

16  testing, manufacturing, selling, and leasing electric vehicles and ADAS technology in general, and the

17  Class Vehicles and Tesla's ADAS packages and technologies in particular.

18  159.   Defendants held themselves out as having special knowledge or skill regarding all

19  these general and particular subject matters. Further, Defendants knew or had reason to know that

20  Plaintiffs and Class members required the Class Vehicles and ADAS packages for a particular

21  purpose, and that Plaintiff and Class members were relying on Defendants' skill and judgment to

22  furnish goods suitable for that purpose.

23  160.   Defendants breached the implied warranty of fitness because they failed to deliver

24  Class Vehicles and ADAS packages that were suited to Plaintiff's and Class members' purpose of

25  purchasing or leasing a fully self-driving car.

26  161.   Defendants breached their warranties by knowingly selling or leasing Class Vehicles

27  equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that

28

1 | were different from what Defendants had represented and warranted. Defendants' breaches were

2 | "willful" within the meaning of Cal. Civ. Code § 1794(c).

3 |      162.    As a direct and proximate result of these breaches, Plaintiff and Class members have

4 | suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing

5 | Class Vehicles and ADAS packages they would not otherwise have purchased or leased;

6 | (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value

7 | than warranted; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS

8 | packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages

9 | that pose a danger to the health and safety of Plaintiff, Class members, and the public.

10 |      163.    The failure of the Class Vehicles and ADAS packages to be as warranted was a

11 | substantial factor in causing Plaintiff's and Class members' harm, which includes the difference

12 | between the prices they paid for their respective Class Vehicles and ADAS packages as warranted

13 | and the actual value of their Class Vehicles and ADAS packages as delivered.

14 |      164.    For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting

15 | Defendants from sending or transmitting false, deceptive, or misleading statements to the public

16 | regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology;

17 | (b) damages caused by Defendants' breaches of the warranties, including economic damages (based

18 | on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and

19 | ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

20 | packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

21 | (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (e) reasonable

22 | attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (f) all other

23 | available relief sought herein.

24 |      WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

25 | **SEVENTH CLAIM**

26 | Fraud and Deceit
Cal. Civ. Code §§ 1572, 1573, 1710

27 |      165.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

28 | above, as though fully set forth in this Claim for Relief.

CLASS ACTION COMPLAINT                                  41

166.    Based on Defendants' conduct alleged in this Complaint, Defendants have engaged in fraud and deceit as set forth in Cal. Civ. Code §§ 1572, 1573, and 1710.

167.    Defendants overstated the utility and safety of Class Vehicles by marketing the Class Vehicles and ADAS packages in a manner that Defendants knew was false and deceptive.

168.    Defendants engaged in misrepresentations, nondisclosure, and concealment of material facts to Plaintiff and Class members, Defendants' conduct was materially false or deceptive, Defendants knew or through reasonable care should have known their conduct was false or deceptive, and Defendants engaged in the conduct with the intent to mislead Plaintiff and Class members.

169.    Plaintiff and the Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and concealment, and were induced by Defendants' wrongful conduct to purchase or lease the Class Vehicles and ADAS packages, which they would not otherwise have purchased or leased.

170.    As a result of Defendants' conduct, Plaintiff and Class members have been harmed. Plaintiff and Class members' reliance was a substantial factor in causing their harm because they were required to stop using Class Vehicles and fear immediate catastrophic injury to themselves and passengers of the Class Vehicles, and people and property surrounding the Class Vehicle.

171.    Plaintiff and Class members have reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

172.    As a direct and proximate result of Defendants' fraud, Plaintiff and Class members have sustained damages in the amount to be determined at trial.

173.    In addition to such damages, Plaintiff seeks punitive or exemplary damages pursuant to Cal. Civ. Code § 3294 in that Defendants engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## EIGHTH CLAIM

Negligent Misrepresentation

174.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

175.     Defendants misrepresented the abilities, limitations, and value of Class Vehicles and ADAS packages by marketing the Class Vehicles and ADAS packages as being capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter.

176.     Defendants' representations were not true because the Class Vehicles were not capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter. Indeed, Defendants appear nowhere near being able to deliver fully self-driving vehicles.

177.     Defendants had no reasonable grounds for believing the representations were true when they made them.

178.     Defendants' misrepresentations, nondisclosure, and/or concealment of material facts to Plaintiff and Class members, as set forth above, were intended by Defendants to mislead Plaintiff and Class members.

179.     Plaintiff and Class members reasonably relied on Defendants' misrepresentations, but were actually misled and deceived, and were induced by Defendants to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased.

180.     Plaintiff and Class members were damaged by Defendants' misrepresentations, and Plaintiff's and Class members' reliance was a substantial factor in causing their harm.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## NINTH CLAIM

Unjust Enrichment

181.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

182.     Plaintiff and Class members paid Defendants the value of Class Vehicles and ADAS packages that were capable of providing them fully self-driving vehicles at the time of purchase or lease, or within a reasonably short period thereafter.

183.    In exchange, Defendants provided Plaintiff and Class members with Class Vehicles and ADAS packages that could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations.

184.    Defendants knew or had reason to know that the Class Vehicles and ADAS packages could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations.

185.    As such, Plaintiff and Class members conferred value upon Defendants which would be unjust for Defendants to retain.

186.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class members have suffered and continue to suffer various injuries. As such, they are entitled to damages in the amount of Plaintiff's and Class members' monetary loss, and restitution of all amounts by which Defendants were enriched through their misconduct.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## TENTH CLAIM
Negligence

187.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

188.    Defendants had a duty to their consumers to exercise a degree of care that a reasonable person in the like position would exercise. Defendants failed to do so. Among other things Defendants had a duty to follow industry custom and standards to accurately represent the abilities, limitations, and value of Class Vehicles and Tesla's ADAS packages and technology.

189.    Defendants breached their duty to Plaintiff and Class members by negligently misrepresenting that the Class Vehicles and ADAS packages had greater abilities and value than they actually had, and fewer limitations and flaws than they actually had.

190.    As a direct and legal result of Defendants' wrongful acts and omissions, Plaintiff and Class members were harmed.

191.    Defendants' negligence was a substantial factor in causing Plaintiff's and Class members' harm, which includes economic harm and other damages to be proven at trial.

1  WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

2  **VII.   PRAYER FOR RELIEF**

3  WHEREFORE, Plaintiff, on behalf of himself and all other Class members, prays for

4  judgment against Defendants and the following relief:

5  1.   An order certifying that this action may be maintained as a class action, appointing

6  Plaintiff and his counsel of record to represent the Class, and requiring Defendants to

7  pay the costs of all Class notice and administration of Class relief;

8  2.   Declaratory and preliminary and permanent injunctive relief prohibiting Defendants

9  from continuing to engage in acts, omissions, and conduct alleged herein that violate

10  any law for which injunctive relief is available, including but not limited to the

11  California FAL, CLRA, and UCL;

12  3.   An award of all recoverable damages, actual, general, special, incidental,

13  compensatory, consequential, statutory, and punitive damages, in favor of Plaintiff and

14  the Class, in an amount to be determined at trial;

15  4.   An order awarding Plaintiff and the Class restitution and disgorgement in an amount to

16  be determined at trial;

17  5.   An award of reasonable attorneys' fees and costs under Cal. Civ. Proc. Code § 1021.5,

18  Cal. Civ. Code § 780(e), and any other applicable law;

19  6.   Plaintiff's and the Class's costs of suit;

20  7.   Pre- and post-judgment interest at the maximum rate provided by law; and

21  8.   Such other and further relief as the Court may deem proper.

22  **VIII.   DEMAND FOR JURY TRIAL**

23  Plaintiff hereby demands trial by jury on all issues so triable.

24  Dated: September 15, 2022                    **BOTTINI & BOTTINI, INC.**
                                                Francis A. Bottini, Jr. (SBN 175783)
25                                              Nicholaus H. Woltering (SBN 337193)

26
                                                _____
27                                                    *s/ Francis A. Bottini, Jr.*
                                                     Francis A. Bottini, Jr.
28

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:      (858) 914-2001
Facsimile:      (858) 914-2002
E-mail:          fbottini@bottinilaw.com
                 nwoltering@bottinilaw.com

*Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT A

EXHIBIT A

1  JENNIFER BERRY
   Assistant Chief Counsel
2  DANIAN HOPP, Attorney IV, SBN 204066
   DEPARTMENT OF MOTOR VEHICLES
3  Legal Affairs Division, Los Angeles Office
   Administrative Law Section
4  320 West Fourth Street, Suite 410
   Los Angeles, CA 90013-2318
5  Telephone: (213) 576-6237
   *Attorneys for Complainant*
6

7

8              DEPARTMENT OF MOTOR VEHICLES

9                  STATE OF CALIFORNIA

10

11  In the Matter of the Accusation Against:        CASE NO. 21-02188

12  TESLA INC. dba TESLA MOTORS INC.,               LICENSE NO. 63277
    a Vehicle Manufacturer,
13                                                   AIMS NO. 21V1L12011

14                                                   **ACCUSATION**

15                     Respondent.

16

17  COMPLAINANT ALLEGES AS FOLLOWS:

18                           **PARTIES**

19      1.  AILENE SHORT (Complainant) brings this Accusation solely in her official

20  capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations,

21  Operations Division, Department of Motor Vehicles.

22      2.  During the times set forth in the Cause for Discipline, TESLA INC. was doing

23  business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of

24  California, under vehicle manufacturer license number 63277 issued by the Department of Motor

25  Vehicles (Department).  Said license is in full force and effect and is scheduled to expire on

26  October 31, 2022.

27  ///

28  ///

___

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By _____

**JURISDICTION**

3. This Accusation is brought before the Office of Administrative Hearings and is conducted pursuant to Vehicle Code § 11705(c).

4. The Department has continuing jurisdiction to file this Accusation pursuant to Vehicle Code § 11721(c).

**CAUSE FOR DISCIPLINE**

5. Respondent made or disseminated statements that are untrue or misleading, and not based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced driver assistance system (ADAS) features.  On at least five dates between May 28, 2021, and July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on Tesla's internet website using the product label and descriptions:

    A. "Autopilot"

    B. "Full Self-Driving Capability"

    C. The phrase:  "The system is designed to be able to conduct short and long-distance trips with no action required by the person in the driver's seat."

    D. The claims:  "From Home - All you will need to do is get in and tell your car where to go.  If you don't say anything, your car will look at your calendar and take you there as the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways.  To your Destination – When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself.  A tap on your phone summons it back to you."

Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving Capability" labels and descriptions represent that vehicles equipped with the ADAS features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous vehicles. These advertisements are a deceptive practice under Civil Code § 1770(a)(5).  Tesla has

1   published disclaimers including one observed June 28, 2022, stating in part: "The currently

2   enabled features require active driver supervision and do not make the vehicle autonomous."

3   However, the disclaimer contradicts the original untrue or misleading labels and claims, which

4   is misleading, and does not cure the violation. Respondent advertised statements not based on

5   facts in violation of Cal. Code Regs. Title 13, § 260.00. Respondent made untrue or

6   misleading statements in advertisements in violation of Vehicle Code § 11713(a).

7   Respondent's acts, omissions, or conduct constitutes cause to discipline a manufacturer license

8   pursuant to Vehicle Code § 11705(a)(10).

9   **PRAYER**

10   6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts

11   or omissions are cause for suspension or revocation of Respondent's manufacturer license and

12   special plates under Vehicle Code § 11705.

13   WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such

14   action against the license of the Respondent as is warranted by the facts of this case, to wit:

15      a.  To suspend or revoke Respondent's manufacturer license and special plates number

16         63277;

17      b.  For an order pursuant to Government Code § 11519.1(a), if applicable, that

18         Respondent pay restitution to the persons or institutions who have suffered financial

19         loss or damage, according to proof; and

20      c.  To order any other and further action as it may deem just and proper under the

21         circumstances.

22   DATED: 7/28/2022

23

24

25   AILENE SHORT
Branch Chief, Industry Services Branch

26   Occupational Licensing Operations
Operations Division

27   Department of Motor Vehicles

28

3

Accusation           In re Tesla Inc. dba Tesla Motors Inc. (Manufacturer) Case No. 21-02188

# DEPARTMENT OF MOTOR VEHICLES
# STATEMENT TO RESPONDENT

*FILED*
*DEPT. OF MOTOR VEHICLES*
*JUL 2 8 2022*
*By Immulcahy*

## ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. *THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT.  PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:*

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below.  If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing. **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings.  If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below.  Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause.  If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause.  Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters:  The hearing shall be conducted in English.  If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied.  However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.).  In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case.  These guidelines are contained in 13 California Code of Regulations, section 440.04.  You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the *Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA  94232-3420, telephone number (916) 229-3153.*

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237



STATE OF CALIFORNIA
**DMV**
DEPARTMENT OF MOTOR VEHICLES
A Public Service Agency

## COPY OF GOVERNMENT CODE SECTION
## 11507.5, 11507.6 AND 11507.7
## PURSUANT TO GOVERNMENT CODE SECTIONS
## 11504 AND 11505.

### *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

### *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a) A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b) A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c) Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d) All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e) Any other writing or thing which is relevant and which would be admissible in evidence;

(f) Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

*11507.7.*

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

## DEPARTMENT OF MOTOR VEHICLES

## STATE OF CALIFORNIA

In the Matter of the Accusation Against:          CASE NO. 21-02188

TESLA INC., dba TESLA MOTORS INC.,
a Vehicle Manufacturer,                           NOTICE OF DEFENSE

_____

                    Respondent.

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____

Address                                           Telephone Number

_____

City                          State               Zip Code

_____

Signature                     Date                Email **(Required)**

**I will need an interpreter at my hearing: Yes _____ No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:     Yes _____     No _____**

ADM 1146 (REV 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820



**BUSINESS REPLY MAIL**
FIRST CLASS   PERMIT NO. 1415   SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

1
2
3 DEPARTMENT OF MOTOR VEHICLES
4 STATE OF CALIFORNIA
5
6 In the Matter of the Accusation Against:         CASE NO. 21-02188

7 TESLA INC. dba TESLA MOTORS INC.,               LICENSE NO. 63277
   a Vehicle Manufacturer,
8                                                  AIMS NO. 21V1L12011

9                          Respondent.            **REQUEST FOR DISCOVERY**

10

11 TO:  TESLA INC. dba TESLA MOTORS INC.

12         Pursuant to Government Code section 11507.6, Complainant requests the following:

13         1. The names and addresses of all witnesses to the extent known by you, including, but

14 not limited to, those intended to be called to testify at the hearing.

15         2. An opportunity to inspect and copy each and all the matters set forth in Government

16 Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17 custody, or control.

18         Please be advised that this request for discovery is continuing in nature.

19 Dated:   **JUL 2 8** 2022

20

21

22

23                                               DANIAN HOPP
                                                 Attorney IV
24

25

26

27

28

                                                  1
   Discovery Request                    Tesla Inc. dba Tesla Motors Inc., Case No. 21-02188

## DECLARATION OF SERVICE

Case Name   :     TESLA, INC., dba TESLA MOTORS, INC.
Case No.     :     21-02188
Court         :     OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento. My business address is 2415 First Avenue, Sacramento, CA  95818.  I am over the age of 18 years and not a party to the within entitled case.

On **July 28, 2022**, I served the following:

### *ACCUSATION; STATEMENT TO RESPONDENT; COPY OF GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA  94538

By the following method:

☒ **US MAIL:** By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested.  I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **E-MAIL:** By causing a true copy of the above described document in pdf form to be e-mailed to the e-mail address/es listed above.  **Opposing party has agreed to be served by email.**

☐ **OTHER SERVICE:**  I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐ Golden State Overnight

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Sacramento, California on **July 28, 2022**.

*MMulcahy*
MAUREEN MULCAHY
Legal Secretary

US Postal Service®
**Certified Mail® Receipt**
*Domestic Mail Only*
*No Insurance Coverage Provided*

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2972 0384 51

| | |
|---|---|
| Postage | $ |
| Certified Mail Fee | $ |
| Return Receipt Fee (Endorsement Required) | $ |
| Restricted Delivery Fee (Endorsement Required) | $ |
| Total Postage & Fees | $ |

Postmark Here

Sent To:

21-02188   (ACC)   SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA 94538

PS Form 3800, April 2015          SEE REVERSE FOR INSTRUCTIONS

# EXHIBIT B

# EXHIBIT B

1 | JENNIFER BERRY
Assistant Chief Counsel
2 | DANIAN HOPP, Attorney IV, SBN 204066
DEPARTMENT OF MOTOR VEHICLES
3 | Legal Affairs Division, Los Angeles Office
Administrative Law Section
4 | 320 West Fourth Street, Suite 410
Los Angeles, CA 90013-2318
5 | Telephone: (213) 576-6237
*Attorneys for Complainant*

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By *MMulcahy*

DEPARTMENT OF MOTOR VEHICLES

STATE OF CALIFORNIA

In the Matter of the Accusation Against:

TESLA INC. dba TESLA MOTORS INC.,
a Vehicle Dealer,

Respondent.

CASE NO. 21-02189

LICENSE NO. 68106

AIMS NO. 21V1L12011

**ACCUSATION**

COMPLAINANT ALLEGES AS FOLLOWS:

**PARTIES**

1. AILENE SHORT (Complainant) brings this Accusation solely in her official capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations, Operations Division, Department of Motor Vehicles.

2. During the times set forth in the Cause for Discipline, TESLA INC. was doing business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of California, under vehicle dealer license number 68106 issued by the Department of Motor Vehicles (Department). Said license is in full force and effect and is scheduled to expire on October 31, 2022.

///

///

1

**JURISDICTION**

2      3. This Accusation is brought before the Office of Administrative Hearings and is

3   conducted pursuant to Vehicle Code § 11705(c).

4      4. The Department has continuing jurisdiction to file this Accusation pursuant to

5   Vehicle Code § 11721(c).

6

**CAUSE FOR DISCIPLINE**

7      5. Respondent made or disseminated statements that are untrue or misleading, and not

8   based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced

9   driver assistance system (ADAS) features.  On at least five dates between May 28, 2021, and

10  July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and

11  July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on

12  Tesla's internet website using the product labels and descriptions:

13      A. "Autopilot"

14      B. "Full Self-Driving Capability"

15      C. The phrase: "The system is designed to be able to conduct short and long-distance

16          trips with no action required by the person in the driver's seat."

17      D. The claims: "From Home - All you will need to do is get in and tell your car where

18          to go.  If you don't say anything, your car will look at your calendar and take you

19          there as the assumed destination. Your Tesla will figure out the optimal route,

20          navigating urban streets, complex intersections and freeways.  To your Destination

21          – When you arrive at your destination, simply step out at the entrance and your car

22          will enter park seek mode, automatically search for a spot and park itself.  A tap on

23          your phone summons it back to you."

24  Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving

25  Capability" labels and descriptions represent that vehicles equipped with the ADAS features

26  will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could

27  not at the time of those advertisements, and cannot now, operate as autonomous vehicles.

28  These advertisements are a deceptive practice under Civil Code § 1770(a)(5).  Tesla has

2

1  published disclaimers including one observed June 28, 2022, stating in part: "The currently

2  enabled features require active driver supervision and do not make the vehicle autonomous."

3  However, the disclaimer contradicts the original untrue or misleading labels and claims, which

4  is misleading, and does not cure the violation.  Respondent advertised statements not based on

5  facts in violation of Cal. Code Regs. Title 13, § 260.00.  Respondent made untrue or

6  misleading statements in advertisements in violation of Vehicle Code § 11713(a).

7  Respondent's acts, omissions, or conduct constitutes cause to discipline a dealer license

8  pursuant to Vehicle Code § 11705(a)(10).

9  **PRAYER**

10  6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts

11  or omissions are cause for suspension or revocation of Respondent's dealer license and special

12  plates under Vehicle Code § 11705.

13  WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such

14  action against the license of the Respondent as is warranted by the facts of this case, to wit:

15   a. To suspend or revoke Respondent's dealer license and special plates number 68106;

16   b. For an order pursuant to Government Code § 11519.1(a), if applicable, that

17    Respondent pay restitution to the persons or institutions who have suffered financial

18    loss or damage, according to proof; and

19   c. To order any other and further action as it may deem just and proper under the

20    circumstances.

21  DATED:  7/28/2022

22

23

24  AILENE SHORT
Branch Chief, Industry Services Branch

25  Occupational Licensing Operations
Operations Division

26  Department of Motor Vehicles

27

28

3

Accusation         In re Tesla Inc. dba Tesla Motors Inc. (Dealer) Case No. 21-02189

FILED
DEPT. OF MOTOR VEHICLES

JUL 2 8 2022

By _[signature]_

## DEPARTMENT OF MOTOR VEHICLES
## STATEMENT TO RESPONDENT

### ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. *THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT. PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:*

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below. If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing. **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings. If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below. Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause. If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause. Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters: The hearing shall be conducted in English. If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied. However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.). In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case. These guidelines are contained in 13 California Code of Regulations, section 440.04. You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the *Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA 94232-3420, telephone number (916) 229-3153.*

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237



A Public Service Agency

# COPY OF GOVERNMENT CODE SECTION 11507.5, 11507.6 AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505.

### *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

### *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a) A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b) A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c) Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d) All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e) Any other writing or thing which is relevant and which would be admissible in evidence;

(f) Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

*11507.7.*

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

# DEPARTMENT OF MOTOR VEHICLES

## STATE OF CALIFORNIA

In the Matter of the Accusation Against:

TESLA INC. dba TESLA MOTORS INC.,
a Vehicle Dealer,

                        Respondent.

CASE NO.  21-02189

NOTICE OF DEFENSE

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____

Address                                         Telephone Number

_____

City                          State                    Zip Code

_____

Signature                      Date                    Email **(Required)**

**I will need an interpreter at my hearing: Yes _____ No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:    Yes _____    No _____**

ADM 1146 (REV. 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST CLASS       PERMIT NO. 1415       SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

1
2
3                      DEPARTMENT OF MOTOR VEHICLES
4                           STATE OF CALIFORNIA
5
6    | In the Matter of the Accusation Against: | CASE NO.  21-02189 |

7    TESLA INC. dba TESLA MOTORS INC.,          LICENSE NO.  68106
     a Vehicle Dealer,
8                                               AIMS NO.  21V1L12011

9                           Respondent.         **REQUEST FOR DISCOVERY**

10
11   TO:  TESLA INC. dba TESLA MOTORS INC.

12           Pursuant to Government Code section 11507.6, Complainant requests the following:

13           1. The names and addresses of all witnesses to the extent known by you, including, but

14   not limited to, those intended to be called to testify at the hearing.

15           2. An opportunity to inspect and copy each and all the matters set forth in Government

16   Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17   custody, or control.

18           Please be advised that this request for discovery is continuing in nature.

19   Dated:      **JUL 2 8 2022**

20

21

22

23                                              DANIAN HOPP
                                                Attorney IV
24

25

26

27

28

                                                   1

## DECLARATION OF SERVICE

Case Name  :   TESLA INC., dba TESLA MOTORS INC.
Case No.    :   21-02189
Court       :   OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento.  My business address is 2415 First Avenue, Sacramento, California 95818.  I am over the age of 18 years and not a party to the within entitled case.

On July 28, 2022, I served the following:

### *ACCUSATION; STATEMENT TO RESPONDENT; GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA  94538

By the following method:

☒ **US MAIL:**   By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested.  I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **OTHER SERVICE**   I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐    Express Mail
☐    Golden State Overnight
☐    Messenger

☐ **FACSIMILE TRANSMISSION**:   On the date below from facsimile machine number (213) 576-6245, I personally transmitted to the above-named person(s) to the facsimile number(s) shown above, pursuant to California Rules of Court 2003-2008.  True copies of the above-described document(s) were transmitted by facsimile transmission and the transmission was reported as complete and without error.  A copy of the transmission report issued by the transmitting machine is attached to this proof of service.

☐ **PERSONAL SERVICE**   By causing a true copy of the above-described documents to be hand delivered to the office(s) of the addressee(s).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 28, 2022, at Sacramento, California.

MAUREEN MULCAHY
Legal Secretary

US Postal Service®

**Certified Mail® Receipt**

Domestic Mail Only
No Insurance Coverage Provided

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2172 0384 68

| | | |
|---|---|---|
| Postage | $ | |
| Certified Mail Fee | $ | |
| Return Receipt Fee (Endorsement Required) | $ | |
| Restricted Delivery Fee (Endorsement Required) | $ | |
| Total Postage & Fees | $ | |

Postmark Here

Sent To:

21-02189  (ACC)  SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA  94538

PS Form 3800, April 2015

**SEE REVERSE FOR INSTRUCTIONS**

# EXHIBIT C

EXHIBIT C

DocuSign Envelope ID: 9B8A069E-A829-4910-A833-95F0CB41AFF4

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Nicholaus H. Woltering (SBN 337193)
  nwoltering@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

*Attorneys for Plaintiff Dominick Battiato*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINICK BATTIATO, on behalf of himself and all others similarly situated,<br><br>                                           Plaintiff,<br><br>        v.<br><br>TESLA, INC., dba TESLA MOTORS, INC.; TESLA LEASE TRUST; and TESLA FINANCE LLC,<br><br>                                           Defendants. | Case No. _____<br><br>**CONSUMER LEGAL REMEDIES ACT VENUE AFFIDAVIT OF PLAINTIFF** |

I, Dominick Battiato, declare and state as follows:

1.      I am over the age of 18 and the Plaintiff in the above-captioned action.  I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2.      I make this affidavit as required by California Civil Code § 1780(d).

3.      The complaint in this action is filed in the proper place for trial of this action because Defendants do business within the Northern District of California and because substantial portions of the events, acts and omissions that are subject to my claims in this matter occurred within the Northern District of California, in Alameda County.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on September 7, 2022.      _____
                                                                             Dominick Battiato

**CLRA Venue Affidavit of Plaintiff Dominick Battiato**